IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2024-NMCA-057

Filing Date: May 13, 2024

No. A-1-CA-40595

STATE OF NEW MEXICO,

      Plaintiff-Appellant,

v.

JAMES MORGAN,

      Defendant-Appellee.

**APPEAL FROM THE DISTRICT COURT OF SANDOVAL COUNTY**
**George Eichwald, District Court Judge**

Raúl Torrez, Attorney General
Santa Fe, NM
Charles J. Gutierrez, Assistant Attorney General
Albuquerque, NM

for Appellant

Bennett J. Baur, Chief Public Defender
MJ Edge, Assistant Appellate Defender
Santa Fe, NM

for Appellee

**OPINION**

**HENDERSON, Judge.**

**{1}**    The State appeals the district court's orders granting Defendant James Morgan's motion to suppress and dismissing the criminal complaint with prejudice. The State argues on appeal that law enforcement had reasonable suspicion to believe that Defendant was either violating several city ordinances or had been involved in an assault or battery. Alternatively, the State argues that, even if law enforcement lacked reasonable suspicion to seize Defendant, Defendant's actions after the seizure constituted a "new crime" that sufficiently attenuated any illegality and therefore the evidence should not be suppressed. The district court found that Defendant was

unlawfully seized because law enforcement lacked reasonable suspicion that he was involved in any criminal activity. The district court did not explicitly rule on the applicability of the "new crime" exception but nevertheless suppressed the evidence obtained as a result of law enforcement's interaction with Defendant. In doing so, the district court implicitly ruled that Defendant's actions did not constitute a "new crime." *See State v. Leyva*, 2011-NMSC-009, ¶ 58, 149 N.M. 435, 250 P.3d 861. Because we conclude that Defendant's actions after the seizure constituted "new crimes," we hold that suppression was not a proper remedy. Therefore, we reverse and remand.

**BACKGROUND**

**{2}**     In July 2020, a Rio Rancho city police sergeant responded to a dispatch regarding a "fight in progress" during which "somebody was being dragged through the street." While the sergeant was headed to the scene, he received additional information from dispatch that there were reports of an all-day party at a house on the same street as the reported fight. Dispatch then reported that the fighting had stopped and people were now "laughing and dancing in the street."

**{3}**     As the sergeant approached the scene of the reported incident, he did not turn on his lights and sirens. Once he arrived, the sergeant parked his marked police car around the corner from the scene. As he got out of his car and approached the cul-de-sac, he heard an argument between two individuals, one later identified as Defendant. When he got closer, the sergeant saw four people standing in the street and approached them. It was just after midnight when the sergeant finally approached the group. He walked down the center of the street, which was unlit except for ambient light. The sergeant was wearing a navy blue uniform with yellow stripes and a badge, as well as a dark-colored face mask due to the COVID-19 pandemic.

**{4}**     Jose Gurrola, one of the four people in the street, was the first to notice the sergeant's approach. Mr. Gurrola warned Defendant of the sergeant's approach before grabbing Defendant's arm and pulling him away. As Mr. Gurrola and Defendant picked up their pace to a near-jog, the sergeant ran to catch up. The sergeant told them to "stop" as he ran towards them. Once the sergeant caught up to Mr. Gurrola and Defendant, he grabbed Defendant's wrist, and Defendant fell to the ground. As the sergeant bent down to restrain Defendant, he was tackled and restrained by Mr. Gurrola, at which point the sergeant let go of Defendant. Only then did the sergeant announce that he was a police officer. At this point, a third individual, Jennifer Morgan, ripped off his badge and then took his radio when he attempted to call for backup. Defendant restrained the sergeant's left arm while Mr. Gurrola sat on his chest and restricted his right hand. The two continued to restrain the sergeant for a minute and a half until backup arrived. Once backup arrived, Defendant released the sergeant and ran toward a house in the cul-de-sac. The sergeant pursued Defendant and eventually tased him.

**{5}**     As a result of this altercation with the sergeant, Defendant was charged with aggravated battery of a peace officer, false imprisonment, and two counts of criminal

damage to property. Defendant filed a motion to suppress all evidence resulting from the altercation with the sergeant, asserting that he was unlawfully seized because the sergeant lacked reasonable suspicion. The State responded, arguing that the sergeant had reasonable suspicion. The day before a hearing on the motion, the State moved for leave to file a surreply, now asserting that suppression was also inappropriate because Defendant's actions constituted a "new crime." At the suppression hearing, the district court accepted the surreply but granted suppression. The State filed a motion for reconsideration, again arguing that the district court should not suppress the evidence from the encounter because Defendant's actions constituted a "new crime." The district court denied the motion to reconsider and as a result dismissed all charges against Defendant. The State appeals.

## DISCUSSION

**{6}**     The issues before us on appeal are (1) whether the sergeant had reasonable suspicion that Defendant was involved in criminal activity at the time of the seizure and; (2) if the sergeant lacked reasonable suspicion, whether Defendant's actions following the seizure amounted to "new crimes." We conclude that Defendant's actions following the seizure constituted a new crime, and thus the district court erred in ordering suppression. Given our holding, we decline to address whether the sergeant had reasonable suspicion to seize Defendant as, in this case, the result is the same. *See, e.g.*, *State v. Pratt*, 2005-NMCA-099, ¶ 1, 138 N.M. 161, 117 P.3d 967 (declining to reach other issues raised on appeal because one issue is dispositive).

**{7}**     "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Ketelson*, 2011-NMSC-023, ¶ 9, 150 N.M. 137, 257 P.3d 957. "First, we look for substantial evidence to support the district court's factual finding, with deference to the district court's review of the testimony and other evidence presented." *State v. Martinez*, 2018-NMSC-007, ¶ 8, 410 P.3d 186 (alteration omitted). When, as here, the district court does not issue formal findings of fact in granting a motion to suppress, we "draw from the record to derive findings based on reasonable facts and inferences." *State v. Yazzie*, 2019-NMSC-008, ¶ 4, 437 P.3d 182 (internal quotation marks and citation omitted). "We then review de novo the district court's application of law to the facts to determine whether the search or seizure [was] reasonable." *State v. Vasquez-Salas*, 2023-NMSC-023, ¶ 9, 538 P.3d 40 (alterations, internal quotation marks, and citation omitted). When "there are no findings of fact and conclusions of law, an appellate court will draw all inferences and indulge all presumptions in favor of the district court's ruling." *State v. Funderburg*, 2008-NMSC-026, ¶ 10, 144 N.M. 37, 183 P.3d 922 (internal quotation marks and citation omitted).

### New Crime Exception

**{8}**     The State asserts that the district court erred in ordering suppression because Defendant's physical altercation with the sergeant constituted a new criminal act, thereby rendering the evidence admissible under the new crime exception to the exclusionary rule. We agree.

**{9}** The Fourth Amendment of the United States Constitution and Article II, Section 10[1] of the New Mexico Constitution "provide overlapping protections against unreasonable searches and seizures." *State v. Yazzie*, 2016-NMSC-026, ¶ 17, 376 P.3d 858 (internal quotation marks and citation omitted). Evidence obtained as a result of an unconstitutional search or seizure must be suppressed pursuant to the exclusionary rule. *State v. Tapia*, 2018-NMSC-017, ¶ 13, 414 P.3d 332. "The [exclusionary] rule is not absolute, but applicable only where its deterrence benefits outweigh its substantial social costs." *Id.* (omission, internal quotation marks, and citation omitted).

**{10}** Our Supreme Court has recognized the new crime exception to the exclusionary rule. *See id.* ¶ 50 (holding that the new crime exception applies to both violent and nonviolent crimes committed in response to unlawful police action). To determine whether the new crime exception applies, we apply the three attenuation factors from *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975): "(1) the lapsed time between the illegality and the acquisition of the evidence, (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct." *Tapia*, 2018-NMSC-017, ¶ 15. The new crime exception is analyzed using the same three-factor attenuation test under both the Fourth Amendment and Article II, Section 10. *See Tapia*, 2018-NMSC-017, ¶ 47.

**{11}** The first factor "requires that we review the lapsed time between the illegality and the acquisition of the evidence." *Id.* ¶ 35. In this case, the State concedes that the first factor weighs in favor of suppression. Although we are not bound by the State's concession on appeal, we agree. *See State v. Tapia*, 2015-NMCA-048, ¶ 31, 347 P.3d 738. "Generally, we weigh this factor in favor of suppression unless substantial time has passed." *State v. Penman*, 2022-NMCA-065, ¶ 43, 521 P.3d 96. Here, the sergeant's seizure of Defendant only preceded the physical altercation by seconds. Therefore, we weigh this factor in favor of suppression.

**{12}** The second factor "requires that we look to any intervening circumstances that serve to attenuate the illegal detention from the discovery of the evidence." *Tapia*, 2018-NMSC-017, ¶ 36. Although the exclusionary rule prohibits the use of evidence that is

---

1We are unpersuaded by Defendant's argument on appeal that this Court should not recognize a new crime exception under Article II, Section 10 when an officer allegedly uses excessive force in initiating an encounter. The federal attenuation analysis has been applied to Article II, Section 10 in cases involving new crimes. For example, in *State v. Penman*, this Court applied the three-part federal analysis to determine whether the defendant's physical altercation with an officer following an unlawful stop was a new crime "sufficient to purge the taint of the initial illegality." 2022-NMCA-065, ¶¶ 43-48, 521 P.3d 96. This Court concluded that the defendant's combative response was sufficiently attenuated from the initial traffic stop and therefore concluded that evidence of the defendant's conduct was admissible. *Id*. ¶ 48. Though *Penman* dealt with nonviolent unlawful police action, the application of the attenuation analysis protected the defendant's state constitutional rights, and we do not see why its application in that case or in this case would be improper. Moreover, the flagrancy of police conduct is already a factor to consider in the attenuation analysis. *See id*. ¶ 45. As our Supreme Court has previously stated, "Application of the three-part federal attenuation analysis comports with our preference to assess the reasonableness of law enforcement by considering the totality of the circumstances of each case." *Tapia*, 2018-NMSC-017, ¶ 47. Thus, we decline to address this argument further.

produced as a result of unlawful police conduct, it does not apply when an intervening circumstance makes "the relationship between the unlawful search or seizure and the challenged evidence . . . sufficiently weak to dissipate any taint resulting from the original illegality." *Id.* ¶ 15 (internal quotation marks and citation omitted). "[A] defendant's independent criminal act may itself constitute an intervening circumstance sufficient to purge the taint of the initial illegality." *Id.* ¶ 36. The question becomes whether a defendant's independent criminal act was sufficiently "separate and distinct" from the officer's initial unlawful act. *See State v. Travison B.*, 2006-NMCA-146, ¶ 11, 140 N.M. 783, 149 P.3d 99.

{13}   Our Supreme Court has previously held that a violation of the right to be free of unreasonable searches or seizures, by itself, does not provide a license to engage in a physical altercation with a law enforcement officer. *See State v. Doe*, 1978-NMSC-072, ¶ 11, 92 N.M. 100, 583 P.2d 464 (holding that "a private citizen may not use force to resist a search by an authorized police officer engaged in the performance of his duties whether or not the arrest is illegal"). We have previously held that such an attack constitutes "new criminal activity that is not subject to the exclusionary rule." *Travison B.*, 2006-NMCA-146, ¶ 9. However, the facts of this case are distinguishable from other New Mexico cases that have addressed the new crime exception as the sergeant failed to identify himself before seizing Defendant. Like many other jurisdictions, New Mexico has not defined the contours of the new crime exception when an officer is unidentified at the time of the seizure. However, New York courts have addressed this issue, and two cases provide guidance on the applicability of the new crime exception.

{14}   In *People v. Cantor*, the New York Court of Appeals held that evidence revealed as a direct consequence of an illegal stop should have been suppressed. 324 N.E.2d 872, 878 (N.Y. 1975). In that case, two plainclothes police officers approached the defendant in front of his home while a third police officer blocked the defendant's car with an unmarked vehicle. *Id.* at 875. Before any of the officers identified themselves, the defendant drew a pistol and pointed it at the officers. *Id.* However, once the officers identified themselves as police, the defendant complied with their orders. *Id.* As a result of this interaction, the defendant was charged with felony possession of weapons and reckless endangerment. *Id.* at 874. On appeal, the court determined that the officers lacked any reasonable suspicion to stop the defendant. *Id.* at 877-78. Thus, it held that the pistol should have been suppressed as the fruit of an unconstitutional seizure as it was "revealed as a direct consequence of the illegal nature of the stop." *Id.* at 878.

{15}   On the other hand, in *People v. Townes*, the New York Court of Appeals declined to suppress evidence that was revealed after, but not as a result of, unlawful police conduct. 359 N.E.2d 402, 405-06 (N.Y. 1976). In *Townes*, the defendant was approached by a plainclothes officer who emerged from an unmarked car. *Id.* at 404. The officer displayed his badge and identified himself as a police officer, at which point the defendant drew a gun and attempted to fire at the officer. *Id.* As a result of this altercation, the defendant was charged with attempted murder, attempted assault, felony possession of a weapon, and resisting arrest. *Id.* The defendant, relying on

*Cantor*, sought to suppress the gun. *Id.* at 405. On appeal, the court distinguished the case at hand from *Cantor*, stating:

> Here the gun was produced after the officers had clearly identified themselves, not before as in Cantor; and here the defendant did not immediately reholster the weapon and comply with the officer's commands, as occurred in Cantor, but rather Townes disregarded those orders, pulled the weapon, aimed it at the officer and attempted to fire it.

*Id.* The court reasoned that the defendant's "free and independent action in pulling and attempting to fire the gun, taken after and in spite of, or perhaps because of, the plainclothesman's identification of himself as a police officer, serves to render any connection between the lawless conduct of the police and the discovery of the challenged evidence so attenuated as to dissipate the taint." *Id.* at 406 (internal quotation marks and citation omitted). Thus, though the court found that the defendant was unlawfully seized by the plainclothes officer, it did not suppress the gun because the defendant's actions were "unrelated to the initial albeit unlawful action on the part of the police." *Id.* at 405.

**{16}** The case at bar is more akin to the circumstances of *Townes* than of *Cantor*. Here, Defendant was approached by the sergeant in the middle of the night. Defendant and Mr. Gurrola began to walk, and then jog away as they were pursued by the sergeant, who had not yet identified himself as a police officer. The sergeant caught up with Defendant and grabbed his wrist, at which point Defendant fell to the ground. As the sergeant reached down to gain control of Defendant, the sergeant was pushed to the ground by Mr. Gurrola and released Defendant. The sergeant identified himself as an officer as he fell. Despite this identification, Defendant continued to restrain the sergeant until additional officers arrived. As in *Townes*, Defendant took action after the sergeant had clearly identified himself, not before as in *Cantor*. Additionally, Defendant did not immediately end his restraint of the sergeant and comply with his commands, as occurred in *Cantor*. Thus, while Defendant may have been unlawfully seized by the sergeant, the evidence should not have been suppressed as Defendant's actions were "unrelated to the initial albeit unlawful action on the part of the police." *Townes*, 359 N.E2d at 405; *see Tapia*, 2018-NMSC-017, ¶ 37 ("Although the interaction between the police and [the d]efendant came about initially as a result of the unlawful seizure, the [d]efendant's response to [the o]fficer . . . was not a natural or predictable progression from the unlawful seizure but rather an unprompted act of [their] own free will.").

**{17}** Though the dissent asserts that we "draw[] inferences from the evidence directly contrary to the district court's decision," *dissent* ¶ 27, we note that the district court made one oral finding of fact that is relevant to our analysis: the sergeant "[did] not announce himself" as an officer. Unlike the dissent, we understand this finding to mean that the sergeant did not identify himself as law enforcement *before* seizing Defendant. However, even if we were to agree with the dissent and interpret the district court's finding to be that the sergeant did not identify himself as an officer at any point during the encounter, we note that the only evidence presented to the district court at the

suppression hearing on this issue was the sergeant's own testimony and the lapel video and audio of the incident. It is uncontested on appeal, and was similarly uncontested at the suppression hearing, that the sergeant identified himself after he seized Defendant. When the district court "rejects uncontradicted testimony based solely on a determination of credibility, [it] should indicate in the record the reasons for doing so. In the absence of such a statement by the court, we infer that it credited the uncontradicted testimony." *State v. Gonzalez*, 1999-NMCA-027, ¶ 16, 126 N.M. 742, 975 P.2d 355 (alteration, internal quotation marks, and citation omitted); *see State v. Jason L.*, 2000-NMSC-018, ¶ 11, 129 N.M. 119, 2 P.3d 856. Because the sergeant's testimony about when he identified himself as an officer was uncontradicted, the court was required to provide an explanation in the record if it disbelieved the sergeant's testimony. Absent that explanation in the record, we presume that the district court believed him. Further, because the sergeant testified that he announced himself as an officer after he was on the ground, and the lapel video supports that testimony, we conclude that the district court lacked substantial evidence to find that the sergeant never identified himself, and we do not defer to this finding on appeal. *See State v. Almanzar*, 2014-NMSC-001, ¶ 9, 316 P.3d 183 (stating that appellate courts review "factual matters with deference to the district court's findings if substantial evidence exists to support them"). Regardless, the dissent concedes that Defendant and the others in the group became aware that the sergeant was a law enforcement officer, and yet continued to restrain him. *See dissent* ¶ 31.

**{18}** Further, the dissent states that, in contrast to *Travison B.*, 2006-NMCA-146, and *Tapia*, 2018-NMSC-017, "there was no clear completion of the unlawful seizure, nor intervening identification of the officer." *Dissent* ¶ 38. However, it is uncontested that the sergeant seized Defendant at the moment he grabbed his arm. Moreover, for purposes of our analysis, we accept Defendant's argument that the sergeant lacked reasonable suspicion for the seizure, and thus it was unlawful. It is also uncontested that the sergeant identified himself after he had been tackled and had released Defendant. In short, Defendant and Mr. Gurrola continued to restrain the sergeant *after* they knew he was an officer. This continued restraint was an intervening circumstance sufficient to attenuate the taint of the unlawful seizure. *See Tapia*, 2018-NMSC-017, ¶ 16 ("[N]otwithstanding a strong causal connection in fact between lawless police conduct and a defendant's response, if the defendant's response is itself a new, distinct crime, then the police constitutionally may arrest the defendant for that crime." (internal quotation marks and citation omitted)).

**{19}** Finally, the third factor "requires that we assess the purpose and flagrancy of the police misconduct." *Id.* ¶ 38. "To be flagrant, more severe police misconduct is required than the mere absence of proper cause for the seizure." *State v. Ramey*, 2020-NMCA-041, ¶ 23, 473 P.3d 13. "[T]o weigh in favor of suppression, a defendant must demonstrate purposeful and flagrant official misconduct where: (1) the impropriety was obvious, or the official knew his conduct was likely unconstitutional but continued nonetheless; or (2) the misconduct was investigatory in design and purpose." *Id.* ¶ 24 (internal quotation marks and citation omitted).

**{20}** First, Defendant argues on appeal that the sergeant conducted himself in a "deliberately aggressive manner" to "provoke a violent encounter that would allow him to potentially arrest people for violent felonies when he knew he could not otherwise detain or arrest them for a misdemeanor."[2] We disagree. Nothing in the record indicates that the sergeant initiated the investigatory stop for any pretextual reason. Defendant cites no evidence in the record that would support such a determination, so we assume none exists. *See State v. Casares*, 2014-NMCA-024, ¶ 18, 318 P.3d 200 (stating that "[w]e will not consider an issue if no authority is cited in support of the issue, because absent cited authority to support an argument, we assume no such authority exists"); *see also State v. Cordova*, 2014-NMCA-081, ¶ 10, 331 P.3d 980 ("[A]rgument of counsel is not evidence." (internal quotation marks and citation omitted)).

**{21}** Second, Defendant argues that in departing from his standard practices of citizen engagement, the sergeant purposefully violated Defendant's rights. We again disagree. The sergeant did testify that he departed from his standard practices by seeking to arrest Defendant for a nonarrestable noise violation, not identifying himself as an officer, and not waiting for backup. However, these breaches of the sergeant's standard practices do not support any reasonable inference that the sergeant's intent in seizing Defendant was anything but to investigate a potential noise violation and the report of a fight in progress. The sergeant testified that he believed he had reasonable suspicion to stop Defendant for unreasonable noise, disorderly conduct, and a battery or assault. Even if the sergeant was mistaken that he had reasonable suspicion to stop and investigate Defendant, we do not view that conduct as flagrant. *See Penman*, 2022-NMCA-065, ¶ 45 (holding that officer's conduct was not flagrant when officer had mistaken belief that he had reasonable suspicion to stop the defendant); *State v. Edwards*, 2019-NMCA-070, ¶ 12, 452 P.3d 413 (describing an officer's conduct in asking questions and asking for identity as negligent when the officer lacked reasonable suspicion for the stop). *Contra Ramey*, 2020-NMCA-041, ¶ 27 (holding that the officer's conduct in "stopping [the d]efendant and requesting his name and date of birth," which was within the department's standard practices, was flagrant as his later "conduct demonstrated that his true purpose in gathering [the d]efendant's information was to run

---

2Defendant also asserts that evidence should have been suppressed because he was illegally stopped and he acted in self-defense when he restrained the deputy. Regardless of the legality of the sergeant's actions, Defendant did not have a license to physically attack a law enforcement officer. *See Doe*, 1978-NMSC-072, ¶ 11. Under such circumstances, the vindication of Defendant's self-defense claim lies in a trial. *See State v. Ellis*, 2008-NMSC-032, ¶ 15, 144 N.M. 253, 186 P.3d 245 (stating that a defendant has a qualified right to a self-defense instruction against a police officer if the officer used excessive force). And even if Defendant's actions were reasonable and could support a meritorious self-defense argument at trial, which we do not opine on here, the exclusionary rule does not require suppression of evidence of the altercation prior to trial based on a theory of self-defense. *See State v. Deisz*, 186 P.3d 682, 687 n.3 (Idaho Ct. App. 2008) ("Even if [the defendant's] actions were reasonable and could support a meritorious self-defense argument at trial, the exclusionary rule would not require suppression of evidence of the shooting prior to trial based on a self-defense theory."); State v. Aydelotte, 665 P.2d 443, 448 (Wash. Ct. App. 1983) ("[The defendant's] response to the police intrusion, if reasonable, may provide a defense to the charges against him. This is for the trier of fact to determine, however, not for the trial court deciding a pretrial motion to suppress.").

a warrant check"). Without evidence, we do not conclude that the sergeant's true purpose in stopping Defendant was to provoke a violent interaction without backup.

**{22}** The dissent disagrees with this analysis, asserting that the proper "inference is that the [sergeant] purposely approached in the dark, without announcing himself, knowing he had no reasonable suspicion of any crime, and seized Defendant knowing it was unconstitutional in order to keep Defendant from walking away and refusing to assist his investigation." *Dissent* ¶ 40. Contrary to the dissent's assertion, the sergeant testified that he had three concerns as he approached the group:

> [O]ne; that there was a report of a fight in progress with somebody being dragged through a street, that's pretty descriptive; so I believe that the anonymous party had witnessed that. The second issue was, there was a mention of a party that had been going on all day, so there was a concern, in my head, that there was a possible noise ordinance violation as well. And thirdly, my concern was, there was a male yelling very loudly at a female; there was a friend near him that appeared to be kind of holding on to him. I wasn't sure if he was trying to restrain this male or not, but my concern was that there was a domestic dispute going on and that may have resulted in the call of somebody dragged through the street of a fight in progress.

The sergeant also testified that "there was a party going on all day, which brought about the noise violation concern and what I heard was quite loud from [the] distance away where I parked. So there was also the issue of unreasonable noise or disorderly conduct . . . ." The sergeant's reasons for approaching the group do not support a conclusion that his conduct was purposeful and flagrant.

**{23}** Contrary to the dissent's assertions, the sergeant never testified that "he knew that no crime was being committed as he approached the group of four friends in the dark." *Dissent* ¶ 40. The sergeant testified that he approached the group to better understand their conversation, which did not require reasonable suspicion, *see State v. Williams*, 2006-NMCA-062, ¶ 9, 139 N.M. 578, 136 P.3d 579 ("Consensual encounters, those in which a citizen feels free to leave, generally do not implicate constitutional protections."). He also consistently testified that he believed he had reasonable suspicion of a noise complaint. Drawing inferences in favor of the district court's conclusion that the sergeant lacked reasonable suspicion, and looking at the evidence in the record, the most we may assume is that the sergeant mistakenly believed he had reasonable suspicion to stop the individuals. A mistaken belief does not rise to the level of flagrant misconduct. *Penman*, 2022-NMCA-065, ¶ 45; *see Edwards*, 2019-NMCA-070, ¶ 12 ("For the violation to be flagrant, more severe police misconduct is required than the mere absence of proper cause for the seizure." (internal quotation marks and citation omitted)). Finally, admission of the evidence in this case would not embolden police to engage in unreasonable seizures. *See Penman*, 2022-NMCA-065, ¶ 27. Instead, we find it more likely that exclusion of this evidence would embolden people to engage in violent, criminal acts after an unreasonable investigatory stop. "The violation

of [a d]efendant's Fourth Amendment or Article II, Section 10 rights does not confer upon [them] a license to commit new crimes, whether they be physical resistance or more passive forms of resistance to government authority." *Tapia*, 2018-NMSC-017, ¶ 48. Thus, the third factor tips the balance away from suppression.

{24} Applying the three attenuation factors, we conclude that Defendant's acts were a new crime and thus the evidence of Defendant's battery on a police officer, false imprisonment, and criminal damage to property charges were sufficiently attenuated from the initial illegal seizure to be admissible. *See id.* ¶¶ 35, 37-38 (concluding that exclusion of the evidence is unnecessary when the first factor weighs in favor of suppression but the second and third factors weigh in favor of attenuation). Therefore, the district court erred in granting Defendant's motion to suppress. This is true even if the initial seizure of Defendant was unsupported by reasonable suspicion because evidence of the commission of new crimes following that seizure are admissible. Accordingly, we reverse the court's grant of Defendant's pretrial motion to suppress that evidence.

**CONCLUSION**

{25} For the reasons set forth herein, we reverse the district court's grant of Defendant's motion to suppress and its order dismissing the criminal complaint. Further, the case is remanded to the district court with instructions to vacate the order of dismissal and to reinstate the case.

{26} **IT IS SO ORDERED.**

**SHAMMARA H. HENDERSON, Judge**

**I CONCUR:**

**MEGAN P. DUFFY, Judge**

**JANE B. YOHALEM, Judge (dissenting).**

**YOHALEM, Judge (dissenting).**

{27} When considering an appeal from an order of the district court suppressing evidence under the exclusionary rule, this Court is required to defer to the district court's findings of fact so long as they are supported by substantial evidence in the record, *see State v. Leyba*, 1997-NMCA-023, ¶ 8, 123 N.M. 159, 935 P.2d 1171, and to view the evidence in the light "most favorable to the prevailing party." *Jason L.*, 2000-NMSC-018, ¶ 10. Where the district court has not made findings of fact, we apply the law to the evidence "draw[ing] all inferences and indulg[ing] all presumptions in favor of the district court's ruling." *Funderburg*, 2008-NMSC-026, ¶ 10 (internal quotation marks and citation omitted). Because, in my opinion, the majority decision draws inferences from the evidence directly contrary to the district court's decision that can only be supported by

overlooking the substantial evidence in the record which supports the court's decision, I respectfully dissent.

**{28}** As set forth below, the evidence, drawing inferences in favor of the district court's decision, as we must, does not support the existence of any of the attenuation factors defining a new crime. *See Tapia*, 2018-NMSC-017, ¶¶ 35-38. I would, therefore, affirm the district court's suppression of the evidence.[3]

**{29}** To explain my conclusion, I first review the substantial evidence in the record supporting the district court's decision to suppress the evidence, and then apply the attenuation factors to that evidence. The record shows that the officer approached a group of four people standing in a residential street talking. The officer had been dispatched because there was a party going on at the end of the street. There was laughing and dancing at the end of the street. It was midnight, and there were no streetlights and no moon. The officer parked his vehicle where it was hidden from view. The officer testified he was wearing dark clothes and a black COVID mask. He approached on foot, in the center of the street where it was darkest, from behind Defendant, who was speaking loudly to Jennifer Morgan. Defendant did not see the silent approaching figure; he was alerted by a friend who was facing toward the figure. There is a strong inference that the officer could not be identified as a police officer in the dark. The district court, in its ruling from the bench, noted that a critical factor in the court's decision to suppress the evidence was the officer's failure to identify himself as a police officer at any time before he seized Defendant, or even when he proceeded to attempt to "gain control of Defendant," who was lying on the ground.

**{30}** Defendant's friend took Defendant's arm when he saw a figure approaching. Defendant was highly intoxicated, and they began to walk away. The officer followed, first at a walk and then jogging to catch up. The officer still did not announce that he was a police officer, nor did he ask the two men to stop and talk to him. Although the officer claimed he said, "Stop," the lapel video contradicts that. At this point, the officer grabbed Defendant's right wrist, while both the officer and Defendant were moving at a slight jog. Defendant, caught between his friend and the officer, fell to the ground. With Defendant on his back on the ground, the officer bent over him, attempting to "gain control of [Defendant]." The officer still did not announce himself as a police officer. As the officer was attempting to complete his physical seizure of Defendant, who was lying on the ground and not resisting, the officer was pushed to the ground from behind by someone other than Defendant. The officer's lapel video shows that he called for backup on his radio, using a code number, and only after calling for backup, identified himself as "police." The officer's testimony confirms this course of events. There was no lapse of time between the seizure of Defendant and the police officer being pushed to

---

3The majority comments that "[t]he district court did not explicitly rule on the applicability of the 'new crime' exception." *Maj. op*. ¶ 1. I take this to refer to the fact that the district court did not make explicit findings of fact on this issue. As noted above, where the district court does not enter explicit findings, our review is still for substantial evidence supporting the decision, drawing all inferences in favor of the district court's decision.

the ground: he was pushed to the ground in the act of attempting "to gain control of [Defendant]," seconds after grabbing him.

**{31}** By that time, everyone was shouting. Not until Jennifer Morgan grabbed the officer's badge is it clear that the group, and Defendant in particular, knew that the man who grabbed his arm, and then attempted to "gain control" of him as he lay on the ground was a police officer. According to the officer, the time period from when the officer finally announced he was a police officer and when backup arrived was one to two minutes.

**{32}** The three-part federal attenuation analysis, correctly adopted by the majority opinion to determine if the commission of a new crime created an exception to the exclusionary rule, must be applied to these facts, bearing in mind when considering the facts that the district court concluded that there was no "new crime." The district court concluded that the deterrent purpose of the exclusionary rule required the suppression of the evidence. *See Tapia*, 2018-NMSC-017, ¶ 13.

**{33}** The first attenuation factor "requires that we review the lapsed time between the illegality and the acquisition of the evidence." *Id.* ¶ 35. The majority agreed with the State's concession that this factor weighs in favor of suppression. *Maj. Op.* ¶ 11. I agree as well. The record shows that there was no temporal separation between the illegal seizure of Defendant and the officer being pushed to the ground. The officer was pushed aside as he bent over Defendant while attempting to secure physical control of Defendant. There is no dispute that the officer had not announced himself as a police officer, nor does his lapel video show that he asked Defendant to stop as Defendant walked away as he approached in the dark. The inference from the evidence drawn by the district court was that it was too dark for Defendant to have visually identified the individual following him, grabbing him and attempting to restrain him, as a police officer.

**{34}** The second factor "requires that we look to any intervening circumstances that serve to attenuate the illegal detention from the discovery of the evidence." *Tapia*, 2018-NMSC-017, ¶ 36. Although the exclusionary rule prohibits the use of evidence that is produced as a result of unlawful police conduct, it does not apply when an intervening circumstances makes "the relationship between the unlawful search or seizure and the challenged evidence . . . sufficiently weak to dissipate any taint resulting from the original illegality." *Id.* ¶ 15 (internal quotation marks and citation omitted). Whether there is a temporal separation is addressed by the first factor; intervening events are the focus of the second factor. "[A] defendant's independent criminal act may itself constitute an intervening circumstance sufficient to purge the taint of the initial illegality," *id.* ¶ 36, if it was "sufficiently separate and distinct" from the officer's unlawful act. *Travison B.*, 2006-NMCA-146, ¶ 11.

**{35}** Here there is no intervening event dividing the officer's illegal seizure of Defendant from the "new crime" allegedly committed by Defendant. The course of conduct by the officer was continuous. He approached without announcing himself, he pursued Defendant without announcing himself, he seized Defendant's arm without

announcing himself causing Defendant to fall to the ground on his back, he attempted to "gain control" of Defendant without announcing himself. Only *after* someone other than Defendant tried to pull him off Defendant and he fell to the ground did he announce that he was "police."

**{36}** There was no clear division between the officer's restraint of Defendant in the dark, without having identified himself, and the actions of Defendant following the officer's identification. The remainder of the incident until police backup arrived lasted one to two minutes, according to the officer's own testimony. The testimony about what happened in the short one-to-two-minute period before backup arrived is limited. There is no testimony about Defendant getting up and attacking the officer. It appears that friends of Defendant restrained the officer until police backup arrived. The sole testimony from the officer about Defendant's involvement in that brief restraint was the officer's testimony that he "believe[s] it was [Defendant who] . . . was trying to restrain [his] left hand." The officer was nonetheless able, with his left hand, to reach his radio and call multiple times for backup.

**{37}** This circumstances in this case are easily distinguished from circumstances where an attack on an officer was found to be sufficiently separated from the officer's unreasonable seizure of the defendant to amount to a new crime. In *Travison B.*, 2006-NMCA-146, ¶ 8, the police officer was attacked by the minor defendant after an illegal entry into a house. In that case, the officer had completed the illegal entry, was plainly visible standing in a well-lit hallway in uniform, had identified himself as a police officer, and had acted entirely lawfully after his illegal entry into the house. The separation of the subsequent attack from the illegal entry was clear.

**{38}** In *Tapia*, 2018-NMSC-017, ¶ 4, the defendant concealed his identity from a police officer during a traffic stop. Although the defendant was stopped without reasonable suspicion that he had committed a traffic offense, the officer proceeded to conduct the investigation following the stop entirely lawfully. There was no question that the defendant knew he was being lawfully questioned by a police officer when he misrepresented his identity. *See id.* ¶ 2. In contrast to these cases, there was no clear completion of the unlawful seizure, nor intervening identification of the officer. Indeed, the officer testified he was trying to secure Defendant in the dark street, without having identified himself as a police officer, when Defendant's friends attempting to intervene and stop him. The restraint of the officer proceeded naturally and predictably from the officer's unlawful seizure of Defendant. *See id.* ¶ 36. Therefore, the second attenuation factor supports the district court's decision suppressing the evidence.

**{39}** Finally, the third factor, which the United States Supreme Court has identified as "particularly significant," *Utah v. Strieff*, 579 U.S. 232, 239 (2016) (internal quotation marks and citation omitted), "requires that we assess the purpose and flagrancy of the police misconduct." *Tapia*, 2018-NMSC-017, ¶ 38. "To be flagrant, more severe police misconduct is required than the mere absence of proper cause for the seizure." *Ramey*, 2020-NMCA-041, ¶ 23 (internal quotation marks and citation omitted). "[T]o weigh in favor of suppression, a defendant must demonstrate purposeful and flagrant official

misconduct where: (1) the impropriety was obvious, or the official knew his conduct was likely unconstitutional but continued nonetheless; or (2) the misconduct was investigatory in design and purpose." *Id.* ¶ 24 (internal quotation marks and citation omitted).

{40}   Although I do not agree that the evidence supports Defendant's argument on appeal that the officer engaged in unlawful conduct purposely to provoke Defendant and the others, the evidence does establish both that the officer knew his conduct was unconstitutional, and that his misconduct was investigatory in design and purpose. Either alone is sufficient to support a finding of purposeful and flagrant official misconduct. First, the officer admitted on cross-examination that he knew that no crime was being committed as he approached the group of four friends in the dark. He explained in his testimony that he wanted to talk to these individuals to "assess the situation," and to investigate whether these four individuals knew anything about an earlier fight. He admitted that he knew they had a right to walk away and not talk to law enforcement. He explained his failure to announce himself as a police officer or to ask them to talk to him, stating that if he had, "by that time they would have run further away." The inference is that the officer purposely approached in the dark, without announcing himself, knowing he had no reasonable suspicion of any crime, and seized Defendant knowing it was unconstitutional in order to keep Defendant from walking away and refusing to assist his investigation. At one point, he claimed, inconsistently with his testimony that there was no crime, that Defendant's loud conversation violated the Rio Rancho noise ordinance. He admitted, however, that he knew that Rio Rancho Police Department policy specified that this was not an arrestable offense during the pandemic. In any event, the district court was permitted to credit the officer's testimony that he knew that he had no reasonable suspicion of a crime and disregard as not credible, the officer's sometimes conflicting testimony. *See State v. Salas*, 1999-NMCA-099, ¶ 13, 127 N.M. 686, 986 P.2d 482 (recognizing that it is for the fact-finder to resolve any conflicts in the testimony of witnesses and to determine which testimony it finds credible).

{41}   This evidence, with all inferences drawn in favor of the court's ruling, as they must be, is sufficient to support a finding that the officer knew he was acting unconstitutionally and proceeded anyway, as well as that the seizure's "design and purpose," was investigatory, satisfying both alternative tests for "purpose and flagrancy of the police misconduct."

{42}   Because, in my view, all three attenuation factors favor the district court's application of the exclusionary rule, I cannot agree with the majority. Therefore, I would affirm the decision of the district court suppressing the evidence.

**JANE B. YOHALEM, Judge**